IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LORETTA GRINER-JOHNS, | |
| Plaintiff, | CIVIL ACTION NO. 06-0920 |
| v. | |
| JO ANNE B. BARNHART, Commissioner of Social Security, | JUDGE DAVID S. CERCONE MAGISTRATE JUDGE CAIAZZA |
| Defendant. | |

**REPORT AND RECOMMENDATION**

**I. RECOMMENDATION**

Acting pursuant to 42 U.S.C. § 405(g), Loretta Griner-Johns ("Griner-Johns" or "the claimant") appeals from a June 7, 2006, final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits. Cross-motions for summary judgment are pending. It is respectfully recommended that the claimant's motion (Doc. 9) be denied, and that the Commissioner's motion (Doc. 11) be granted.

**II. REPORT**

**A. PROCEDURAL BACKGROUND**

On August 22, 2003, Griner-Johns filed an application for disability insurance benefits and supplemental security income.

She claimed that she was disabled on July 26, 2003 when the motorcycle she was operating slid on gravel during a turn, fracturing her left tibia and left humerus. Griner-Johns alleged that following this accident she suffered from severe low back pain radiating down her left leg and causing numbness in her heel, depression, anxiety, insomnia, and migraine headaches. The Commissioner denied this application on July 18, 2005, and the claimant requested that a hearing be held.

On February 7, 2005 a hearing took place before an administrative law judge ("ALJ") in Latrobe, Pennsylvania. Griner-Johns, who was represented by counsel, and a vocational expert offered testimony. Following supplementation of the record with additional medical evidence and updated answers to interrogatories posed to the vocational expert in light of the additional evidence, the ALJ denied Griner-Johns's claim. In an opinion dated July 18, 2005, the ALJ concluded that the claimant retained the residual functional capacity to perform a limited range of light work, and that jobs consistent with Griner-Johns's capacity were available in substantial numbers in the national and local economies.

Griner-Johns requested review of the ALJ's decision and, on June 7, 2006, the Appeals Council affirmed the findings of the ALJ, making the ALJ's decision the final decision of the Commissioner. This timely appeal followed.

2

## B. FACTUAL BACKGROUND

At the time of the hearing, the claimant was a forty-four year old divorced high school graduate with some community college credits toward a degree in nursing, and a certificate as a nurse's aide. (Doc. 8-6 at 14). Her most recent employment had been in food service management where she was required to lift, stand and walk during the majority of her working hours.

Griner-Johns also had experience as a clothes sorter for Goodwill where her time was spent lifting, standing, and walking. Prior to Goodwill, the claimant worked as a laborer in a sporting goods store. She regularly climbed ladders and lifted boxes during stocking. Her other employment history included managing a produce market, and working as a nurse's aide. Id. at 14-20.

At the hearing, Griner-Johns described her motorcycle accident, and testified that the surgery to repair her leg required thirteen screws and a steel plate. She was forced to quit her job. Id. at 13. When asked to describe the basis for her disability claim, Griner-Johns stated that her primary complaint was back pain. Id. at 24. She rated this pain, even with medication, at eight on a ten point scale. Id. at 25. She stated that she experienced swelling in her knee, and had decreased range of motion in her leg. Id. at 15. Muscle spasms caused intense pain about twice a week. She stated that she had suffered back pain since the accident, and that she had undergone physical therapy and used heat and a TENS unit. The pain medication that

3

she was taking to alleviate discomfort in her knee was ineffective for her back pain. Id. at 24. She described the pain as radiating down her leg, the intensity varying with the quality of her sleep. She described difficulty sleeping, stating that she takes two drugs for insomnia. These drugs affect her memory and her ability to concentrate. Id. at 27

Griner-Johns also told the ALJ that she was depressed. She stated that Lexapro did not help, and that sometimes she "didn't want to wake up because of the pain." She was "anti-sociable" because she did not want to burden people. Id. at 26. The claimant also complained of having panic attacks and chest pain, "hear[ing] things," and "feel[ing] something like a cat jumping onto her bed when there is nothing there." Id. at 26,27. She often heard a ringing sound, and suffered from mood swings.

Last, Griner-Johns testified that she suffers from migraine headaches four or five times per week. These last from hours to three days. She rated the pain from these headaches at over ten on a ten point scale. Imitrex and samples of other pain medication did not work, and caused her to feel drowsy, dopey, and sick to her stomach.

When asked to describe her physical limitations, the claimant stated that she could walk or sit for about twenty minutes, stand for thirty, do stairs one at a time with difficulty, and lift about five pounds. Id. at 30. She could kneel on her right leg, but not on her left, and could squat or

crouch "just to pick something up." Id. at 31. Her normal daily activities included self-care. She could brush her teeth, shower with the aid of a chair, but not every day, microwave meals, do laundry, and wash dishes, although it took a long time. Id. at 32-42. She testified that a friend helped her clean, vacuum, and dust. She also needed help grocery shopping, driving, and loading and unloading the food. Usually someone took her to appointments, but she was able to drive sometimes and occasionally attended church. Friends periodically visited her, but she was unable to visit them on her own. She ate out sometimes, and enjoyed reading and taking care of her plants and snakes, although this was sometimes difficult. Id. at 33-34.

### C. **THE MEDICAL RECORD**

Shortly after her accident, Griner-Johns visited orthopedist, Gregory Hung, M.D. ("Hung or Dr. Hung") four times. On December 12, 2003, her last scheduled visit with him, the claimant told him that she experienced occasional pain in her left leg. She was able to walk with a straight cane, and had full range of motion in her shoulder. She had full extension and 130 degrees of flexion in her knee. Hung described the claimant as "doing well" and thought that she should be able to return to work in about six weeks. (Doc. 8-3 at 21).

During the time that Griner-Johns was being treated by Hung, he referred her for physical therapy at Latrobe Hospital. A

summary of her initial therapy was provided to Dr. Hung on November 11, 2003. Id. at 32. The summary indicated that the claimant rated her pain at night at seven, and at four during the day. She was able to go up and down stairs. No significant physical deficits were noted or raised by the claimant. Dr. Hung notified the physical therapist that Griner-Johns did not require additional therapy.

During the four months following her accident, Griner-Johns was also seen by her primary care physicians. She asked for and was given Xanax, stating that she was anxious about the accident and the service of divorce papers. The record does not show that the claimant complained of back, leg, or headache pain, although she did take Percocet. Id. at 55. Her Xanax prescription was refilled at a reduced strength in October 2003, and she was told that she would not be given more. The record of her October examination reflects that Griner-Johns denied suffering from leg or back pain, headaches, ringing in her ears, nausea, vomiting, or diarrhea. Except for the fact that she wore a leg brace and was in a wheelchair, her physical exam was normal.(Doc. 8-5 at 221).

On January 6, 2004, Griner-Johns reported to the emergency room at Latrobe Area Hospital, complaining of intense burning pain in the center of her lower back. (Doc. 8-3 at 54). She asked for and was given an injection of Demerol. Her physical examination was normal except for some tenderness along the

6

spine. Her psychological examination was also normal. X-rays did not reveal any anomalies. (Doc. 8-4 at 1). On January 8, 2004, the claimant visited her primary care physician, asking for a sports medicine referral for evaluation of her back pain. Id. at 224. She was also referred for physical therapy at Latrobe Hospital. Id. at 179. She requested pain medication, and was given Ultram.

Griner-Johns was seen by orthopedic specialist W. Timothy Ward, M.D. ("Dr. Ward" or "Ward") on January 12, 2004. The claimant told Ward that she was troubled by intermittent low back pain. Ward concluded that Griner-Johns did not have true leg pain as "clinically, her motor, sensory, and reflex examinations were normal in both lower extremities, a straight leg test was negative, and her x-rays showed a normal lumbar spine." Id. at 216.

On January 28, 2004, the claimant changed primary care physicians, and was seen for the first time by Carl Scheler, M.D. ("Dr. Scheler" or Scheler"). He completed an employability re-assessment form for her on that initial visit, indicating that she was temporarily disabled as of January 27, 2004 and could be expected to remain disabled until January 26, 2005. Id. at 6. Dr. Scheler wrote that the claimant suffered from lower back pain, depression, and anxiety, but did not mention headaches. Dr. Scheler saw Griner-Jones on eight other occasions in 2004. Though significant portions of his notes are illegible, it appears that

his overall diagnoses remained lower back pain, depression, and anxiety.

An MRI of the lumbar spine performed on February 11, 2004 did not show any abnormality.(Doc. 8-4 at 4).

From mid-April to mid-June 2004, Griner-Johns returned to physical therapy at Latrobe Hospital, but did not complete the full course of treatment. "She continued to report pain throughout her treatment sessions, rating it an average of 7/10 and was reporting no significant improvements upon her last session . . . The patient reported difficulty with any strengthening activity." (Doc. 8-5 at 16).

On October 4, 2002, the claimant returned to orthopedist Hung, complaining of "diffused aching pain in her left leg. At times, she has sharp pain." Dr. Hung determined that this pain was "likely due to early osteoarthritis," and provided her with samples of Celebrex. Id. at 27).

Griner-Johns returned to Dr. Scheler in January and February, 2005 complaining for the first time of migraine headaches in addition to her other problems. Dr. Scheler prescribed Imitrex. When, later the same month, the claimant informed him that this medicine had been ineffective, he provided her with samples of other medication. In March 2005, Dr. Scheler completed a physical residual functional capacity questionnaire evaluating the claimant. Id. at 37. He diagnosed a dull constant back ache, migraine headaches, depression, and

trauma to the left leg. He and described her symptoms as headache, dizziness, lower back pain, muscle spasms, nausea and vomiting, heartburn, and anxiety. Nonetheless, he rated her prognosis fair to good. When asked to identify the clinical findings and objective signs substantiating the pain described, he wrote: "Obvious scar left leg." Id.

Dr. Scheler wrote that the medications taken by the claimant did not impair her ability to work, i.e., she did not experience dizziness, drowsiness, nausea, or other debilitating side-effects. It was the doctor's opinion, nonetheless, that she was unable to perform even low stress jobs. He stated that she could walk only about a block without severe pain, sit or stand at one time for twenty to thirty minutes, sit or stand for less than a total of two hours in an eight hour working day, and would be required to walk for ten minutes at fifteen minute intervals. She would need frequent unscheduled ten minute breaks and would be required to elevate her legs for up to half of the work day. She could only rarely lift or carry less than ten pounds and could never lift or carry more. She could never stoop, crouch, or climb ladders, could rarely climb stairs, and had significant limitations with reaching, handling, and fingering. He estimated that the claimant would need to miss work in excess of four days per month.

The final item in the medical record is a report prepared following the hearing by Roger C. Searfoss, M.D. ("Dr. Searfoss"

or "Searfoss"), at the request of the ALJ. Id. at 43. Dr. Searfoss conducted a history and physical, discussing these in terms of the negative clinical data. He observed that the claimant was able to "walk reasonably well" without her cane, and that her "station and stance were steady." Her range of motion was normal everywhere except for a very minimal limitation in her lumbar spine. Her sensory exam and reflexes were normal, and he did not find atrophy in the muscles of her left leg. Dr. Searfoss summarized his findings by writing, "She has ongoing complaints of low back pain, although her work up has been negative and her physical examination has been negative." Id. at 43. Based on his examination, Dr. Searfoss found that Griner-Johns could occasionally life thirty-five pounds, and could frequently lift twenty-five pounds. She could stand or walk six hours per day, two or three hours at a time. Her ability to sit was unlimited. She could occasionally climb, kneel, and crawl, and could frequently stoop, balance, and crouch. Dr. Searfoss concluded that the claimant had no other limitations.

### D. **THE ALJ'S DECISION**

The ALJ arrived at her finding that Griner-Johns was not disabled within the meaning of the Social Security Act ("the Act") by applying the sequential five step analysis articulated at 20 C.F.R. §404.1520. She resolved this matter at Step 5.

Finding that Griner-Johns had not engaged in substantial gainful employment since the alleged onset of disability, the ALJ

next considered the severity of the alleged impairments. The ALJ found that Griner-Johns had established that she suffered from degenerative joint disease caused by her injuries, and that this impairment was severe. The ALJ concluded that the claimant's headaches did not constitute a severe impairment because the record failed to show that they had lasted for a continuous period of at least twelve months.

The claimant's alleged mental impairments, depression and anxiety, were also characterized as not severe. She had never been referred to or sought treatment from a therapist or psychiatrist, and had never been hospitalized as a result of her mental condition. These impairments were generally controlled by medication, and were not supported by specific symptoms or clinical findings indicating that the ability to perform basic work activities was limited. The ALJ concluded that Griner-Johns's mental impairments imposed only mild limitations on her ability to work. The ALJ also noted that the claimant's mental and physical impairments, considered alone or in combination, did not meet or equal the severity of those found at 20 C.F.R. §§ 404.1520 (d) and 416.920(d).

Next, the ALJ addressed Griner-Johns's residual functional capacity, taking into account all of the symptoms that could reasonably be accepted as consistent with the objective record evidence. She found that Griner-Johns retained the capacity to perform simple unskilled work at the light exertional level. She

could stand or walk up to six hours, two hours without interruption, could sit for unlimited periods of time, and could climb, kneel, and crawl occasionally. The ALJ found that the evidence showed that the claimant's medications effected some difficulty in concentration, and that her allegations of pain were partially credible. The ALJ concluded, however, that the evidence did not support the degree of impairment alleged by the claimant.

The ALJ commented specifically on evidence provided by treating physician, Dr. Scheler. She found that his opinion conflicted with the remainder of the medical evidence in that it was unsupported by objective studies, detailed treatment notes or the claimant's reported activities of daily living. Dr. Scheler described Griner-Johns's pain as only a "dull ache" and wrote that she did not suffer any side effects from her medications.

The ALJ gave significant weight to the findings of Dr. Searfoss, holding that his conclusions were in accord with the other record evidence. Based on the evidence bearing on the claimant's residual functional capacity, the ALJ found that she was not able to perform her past relevant work; the claimant's prior employment was comprised of jobs requiring more than simple unskilled work exceeding the light exertional level. In order to determine whether there were jobs available to accommodate a person with the claimant's residual functional capacity, the ALJ posed questions to a vocational expert, both at the hearing and

afterward, based on Dr. Searfoss's supplemental report, in the form of interrogatories. The expert testified that there were jobs in significant numbers in the national economy that the claimant could perform. These included jobs as a receiving clerk, laundry sorter/folder, building manager, and stock clerk. (Doc. 8-3 at 1).

Because the ALJ found that Griner-Johns retained the capacity to perform available work, she held that the claimant was not under a disability within the meaning of the Act, and was not, therefore, entitled to benefits.

### E. STANDARD OF REVIEW

The Act limits judicial review of the Commissioner's final decision regarding benefits to whether the factual findings are supported by substantial evidence, Brown v. Brown, 845 F.2d 1211, 1213 (3d Cir. 1988), and whether the correct law was applied. Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984).

### F. ALLEGATIONS OF ERROR

**1. The ALJ mischaracterized the severity of claimant's headaches.**

The claimant contends that her complaints regarding migraine headaches were longstanding and should have been deemed severe. The record is, however, devoid of medical evidence relating to headache pain prior to 2005. The 2003 medical records that the

claimant cites to document the chronic nature of her headaches do not support her allegations. At that time, she told her treating physician - who was not Dr. Scheler - that she had once suffered from but no longer experienced migraines. (Doc. 8-5 at 1). In fact, the record does not contain a single headache complaint or reference to headache medication prior to the claimant's scheduled visit with Dr. Scheler in January 2005. The court is convinced that the claimant mischaracterizes the notes of that visit when she contends that she complained of a migraine headache lasting a full month. Id. at 18. A much more reasonable reading of the notes is that Griner-Johns instead complained of headaches occurring over the course of a month prior to the visit. Id. The notes do not show that the claimant contacted her doctor about a headache prior to her visit, sought an earlier appointment, or that her complaints gave Dr. Scheler cause for particular concern. He did not refer her to a specialist, and did not record information describing the nature and frequency of the pain, or its impact on the claimant's activities.

   Given the evidence regarding the onset of and treatment for her headaches, the ALJ reasonably found that Griner-Johns's testimony regarding the extreme severity of her pain was only partially credible. As a general rule, courts must defer to the ALJ's credibility determination given her unique opportunity to assess the witness's demeanor. *See, e.g.,* Atl. Limousine, Inc. v. NLRB, 243 F.3d 711, 718 (3d Cir.2001). This is especially true

where, as here, the witness described her pain and its consequences in detail, and the ALJ anchored the credibility determination in the specifics of the medical evidence. *See, e.g.*, Reefer v. Barnhart 326 F.3d 376 (3d Cir. 2003). The court also fails to find any ground upon which to challenge the ALJ's conclusion with respect to the durational requirements of the Act. Dr. Scheler's opinion that the claimant's headaches had persisted or could be expected to persist for a continuous twelve month period is not supported by his own records, or by the other medical evidence.

### 2. **THE ALJ Erred in not Finding a Severe Mental Impairment**

According to the relevant regulation, a "severe mental impairment" is one that significantly limits the ability to carry out "basic work activities." 20 C.F.R. §§ 404.1521, 416.921. The claimant argues that the ALJ erred in concluding that her mental impairments were not severe. She bases this contention on the fact that she regularly complained of and was given medication for these disorders, her limited ability to carry out the activities of daily life, and on the opinion of her treating physician.

While the medical evidence shows that Griner-Johns suffers from and has been medicated for depression and anxiety, this alone is not sufficient to establish that these impairments are

severe. Her depression was managed by her primary care physicians. The record also fails to establish that her medication was ineffective, or that it was necessary to increase the dosage.

It is also undisputed that Griner-Johns needed help with household chores such as mowing her grass, gardening, cleaning and grocery shopping, and that she had difficulty negotiating stairs and standing in the shower. The record, however, does not suggest that any of these limitations resulted from mental rather than physical impairments.

The only medical evidence indicating that Griner-Johns suffered from severe mental impairments is the statement of her treating physician, Dr. Scheler. As the court has noted, Dr. Scheler's conclusions are not supported by the type and extent of treatment received by the claimant, and are contradicted by the remainder of the medical evidence. None of the other doctors seeing or treating the claimant raised concerns about her mental function, and none recorded problems associated with her memory, ability to follow directions, anger management, social relationships, or other mental factors that could impede her ability to carry out basic work activities.

In sum, the court does not find error in the ALJ's finding that the mental impairments supported by the record imposed mild limitations on Griner-Johns's ability to function. These limitations were taken into account in the ALJ's assessment of

the claimant's residual functional capacity.

### 3. Dr. Scheler's Opinion was Accorded Insufficient Weight

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d. Cir. 2000). "[The] ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence." Lockley v. Barnhart, Civil Action No. 05-05197, 2006 WL 1340866 at*4 (E.D. Pa. May 16, 2006)(citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d. Cir. 1984)). This does not mean that a treating physician's opinion is unassailable. The regulations make clear that there are factors which may favor rejecting or diminishing the weight given to that opinion.

The ALJ is authorized to consider the nature and extent of the treatment history, 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d)(2)(ii), the extent to which the opinion is explained and supported by other evidence in the record, 20 C.F.R. §§ 404.1527(d)(3),416.927(d)(3), whether the opinion is consistent with the entire record, 20 C.F.R. §§ 404.1527(d)(4), 416.927 (d)(4), and the extent of the source's familiarity with the other record evidence, 20 C.F.R. 404.1527(d)(5), 416.927(d)(5). The

17

case law is in accord. See e.g., Newhouse v. Heckler, 753 F.2d 283(3d Cir. 1985)(holding that treating physician's report is not binding absent supporting clinical data).

The ALJ in this matter rejected Dr. Scheler's finding that Griner-Johns was completely disabled. She explained this rejection fully, citing her assessment of the claimant's credibility and the contrary medical evidence, particularly the report of Dr. Searfoss. The ALJ's decision is well supported by the record. The court has already referenced the fact that Dr. Scheler's findings were conclusory and his treatment notes were sketchy. He did not explain his difference of opinion, and did not refer to the contrary clinical data.

Although Dr. Searfoss examined the claimant only once, his report is more thorough than the compendium of records submitted by Dr. Scheler. Dr. Searfoss analyzed other medical opinions and clinical data in setting the claimant's exertional and nonexertional limitations. While it is not generally the case that the report of a one-time examining physician will be accorded more weight than the report of a treating physician, here, the reasoning of the ALJ was sound.

The court does not find any basis for concluding that Dr. Scheler's opinion was given insufficient weight.

### III. CONCLUSION

Because the decision of the ALJ was supported by the

evidence and was consistent with applicable law, the Motion for Summary Judgment filed by the Commissioner (Doc. 11) should be GRANTED, and the motion filed by the claimant (Doc. 9) should be DENIED.

In accordance with the Magistrate's Act, 29 U.S.C. § 636 (b) (1) (B), 636 (b)(1)(b) and (c), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by January 2, 2006. Responses to objections are due by January 12, 2006.

December 15, 2006.

/S/ Francis X. Caiazza<br>Francis X. Caiazza<br>U.S. Magistrate Judge

cc:

Counsel of Record
Via electronic mail